Commonwealth *v.* Derembeis et al., Appellants.

Argued April 8, 1935.

Before KELLER, P. J.,
CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, JAMES
and RHODES, JJ.

*Premo J. Columbus,* for appellants.

*Roy T. Clunk,* Assistant District Attorney, with him
*Andrew T. Park,* District Attorney, for appellee.

OPINION BY CUNNINGHAM, J., December 18, 1935:

The separate appeals of Nicholas Derembeïs and
John Arendash from their respective sentences of not
less than twelve and one-half nor more than twenty-
five years to the penitentiary, following their joint con-
viction of the crimes of mayhem and robbery, may be
disposed of in a single opinion.

Upon a careful review of the record in this unusual
case, we have reached the conclusion that it should be
retried in order to safeguard the administration of
justice as between the Commonwealth and these ap-
pellants.

Our decision is not based upon any specific assign-

ments of error, but upon the broad ground that the case was not tried as fully and carefully as the gravity of the charge and the dangerous character of the evidence introduced and relied upon by the Commonwealth demanded.

Within a few minutes after eleven o'clock in the forenoon of April 12, 1934, a most atrocious crime was committed in a bowling alley in the Oakland District of the City of Pittsburgh by three young men. At that hour George Stratigoes, the proprietor, was alone in his place of business and engaged in sweeping one of the alleys. Three men suddenly entered the building by the front door; one of them thrust a revolver against Stratigoes' back and said, "Go back to the toilet;" upon reaching the toilet Stratigoes was compelled to give his assailants $15—all the money he had upon his person.

Then followed the unusual and fiendish part of this holdup. For no apparent reason, other than to prevent subsequent identification, one of the thugs deliberately and permanently blinded Stratigoes. The record does not disclose just how the injury was inflicted, nor were any of the physicians who treated the victim at the hospital to which he was removed called at the trial.

About four months later Derembeis and Arendash were arrested upon suspicion of having participated in the commission of various robberies unconnected in any way with the Stratigoes case. Suspicion was aroused as to Derembeis having possibly been concerned in the Stratigoes robbery by an incident thus described by Thomas Morgan, a police officer: "We had taken them in to the detective bureau after their arrest and we were questioning them on several hold-ups we suspected and had his [Derembeis'] picture identified and questioning him on those different jobs of robberies and he says, 'If I pulled any of those jobs you can jab my Goddamn eye out,' and put both fingers this way (indicating) and by making that assertion and the

description answering he and the other two defendants, the other defendant, I immediately got Mr. George Stratigoes for the purpose of identifying them on his hold-up and loss of eyesight." This incident led up to a proceeding referred to throughout the testimony as the "stand-up" at No. 1 Police Station. It was a plan devised to afford Stratigoes an opportunity to listen to the voices of half a dozen men, including the suspects, Derembeis and Arendash, for the purpose of ascertaining whether he could identify any of them as voices with which he was familiar. It is essential to an understanding of Stratigoes' testimony in court that some reference be made at this point to the circumstances under which the stand-up was conducted.

We have no doubt that, as a preliminary to the testimony of Stratigoes himself, it was competent for the Commonwealth to show the manner in which the tests were made and that as a result of what there occurred these appellants were brought to trial. Whether those parts of the testimony in which the conversations of certain detectives and reporters with Stratigoes were related and Stratigoes' declarations (not made in the presence or hearing of appellants) placed upon the record were admissible, is an entirely different question and will be hereinafter considered.

Stratigoes, his son and two newspaper men, Ambrose and Early, were stationed in a room at the police station. Detective Morgan then had six men, (three of them city detectives, two of them the appellants and the sixth a brother of Arendash) brought into the room; they were arranged in a row and each given a number. The purpose of the investigation was not disclosed to appellants. Morgan, standing in the rear of the room, asked each of the six, in turn, a series of questions—such as name, age, address, whether employed, etc. Appellants voluntarily and freely answered each question as, of course, did each of the other four. The six

162

men were then taken out of the room, but were again brought in, numbered from the other end of the line, and again interrogated. This proceeding was repeated a third time. Stratigoes made no statement or accusation in the presence or within the hearing of either appellant.

Stratigoes is a Greek and when called at the trial labored under the double handicap of unfamiliarity with our forms of expression and blindness. These facts, however, would not necessarily account for the vagueness and uncertainty of much of his testimony.

As his was the only testimony in the entire case which connected, or even tended to connect, either appellant with the commission of the crime, and as it is impossible to describe it with any degree of accuracy, we are obliged to quote liberally. His account of the robbery, on direct-examination, reads: "A. In the morning on the 12th day of April, I got there about a quarter to 11, and before 11 o'clock somebody come in to use the toilet and went out. Eleven, about five after 11, three boys came in and held me up and robbed me. Somebody pointed a gun on me, I was standing by No. 3 alley, and ordered me to go to the men's toilet and they robbed me. I fainted, before, I don't know what happened to me and in half an hour I went next door for help and nothing else. Q. Now, Mr. Stratigoes, you say there were three came in, is that right? A. Yes, sir. Q. Where were you in the bowling alley, Mr. Stratigoes? A. I was working at No. 3 alley in the platform there. Q. You were working on it, what were you doing to it, if anything? A. Dusting off, sweeping it. Q. Were you facing the door or your back towards the door there at that time? A. How is that? Q. Were you facing the door when these three men came in or was your back towards the door? A. I was working, I don't remember which way I was facing. Q. Did you see them come in? A. Yes. Q. And can

you give us some idea of what they looked like, a general description of the three men that came in there, George? A. I remember one well now. The others, really, I don't remember well. One was 5, 8, and was lighter than me. Q. Lighter than you? A. Light weight than me. Q. How much do you weigh? A. About 185. Q. Now, what did the other two look like, generally? A. Smaller size. Q. About how tall? A. Oh, about 5, 6. Q. Five feet, 6. Now, did they have light or dark hair, do you remember? A. Dark. Q. Were they heavy or medium or light in weight, would you say? A. Lighter, I mean lighter than the first one. Q. Did you give that description to the police officers at that time? A. I believe I did. Q. Did you know any of their nick names, any way they were called, did you hear their names mentioned during this robbery? A. I don't remember now. Q. And were you knocked unconscious there during the course of the robbery? A. Pardon me. Q. Were you knocked out, knocked unconscious? A. Yes. Q. In the toilet there during the robbery? A. Yes, at the toilet. Q. You were knocked out? A. I was fainted, I don't remember what happened. Q. You don't remember whether you fainted or knocked out? A. I don't know more about it. I was unconscious on the floor there. I know when I woke up, there was nobody there. Q. Now, did you see a gun on any of these men, Mr. Stratigoes? A. Yes, sir. Q. Do you know which of the three men had a gun? A. The first one walked into me first. Q. Was he the large man? A. The large man. Q. What, if anything, did he say at that time? A. 'Go back to the toilet.' Q. Now, did either of the other men talk during this holdup? A. I don't remember now. Q. You don't remember now. Do you remember saying at any time, Mr. Stratigoes, that you could identify any of them by their voices? A. Yes. Q. Do you remember going down to the police station? A. Yes, sir. Q.

164

Now, will you tell the court and jury what happened down there at the police station, as you recollect it? A. I heard voices which was familiar to me in my place. Q. Now, you couldn't see who was speaking? A. No, not at all. Q. And did you hear somebody ask certain questions and other people giving answers? A. Yes. Q. Now, were they all different voices? A. Different voices. Q. Do you remember how many different voices you heard there, that is answers to questions? A. I remember about six, remember six men. Q. There were six men? A. Yes. Q. After you heard the first question and answers, Mr. Stratigoes, were you asked to identify any of the voices that you heard? A. Two of the four—two out of the bunch. Q. You did identify two out of the bunch. Now, how did you make that identification. Just tell the court and jury. A. I heard such voices before in my place. Q. You had heard it before in your place? And did you identify them by number or name? A. By number only. Q. And did you pick out certain numbers at the first stand-up? A. Yes, sir. Q. And did you know who those men were before you picked out the number? A. No, sir. Q. And then was there a second stand-up? A. Yes, sir. Q. And did they have the same proceeding as to questions and answers? A. I don't know. Q. I mean, did you hear certain questions asked? A. Different questions. Q. There were six men that were being asked? A. Yes, sir. Q. And did you pick out two of those six that were familiar to you, is that correct? A. Yes. Q. Now, do you recollect, Mr. Stratigoes, whether they were the same numbers that you picked out the first time, that is in the same rotation? A. I only remember the same voices the second time, I didn't remember the numbers."

On cross-examination, Stratigoes, after stating he had not seen any of the three in his place of business for about ten days preceding the robbery but that they

had been there upon about ten previous occasions, continued:

"Q. Don't you, Mr. Stratigoes, do you remember them pretty well after bowling there ten times? A. Yes, sir. Q. And did you note anything peculiar about their speech—now when these boys—I will withdraw the question. When these three men came in about 11 or fifteen minutes after 11, as you said, who had the gun in his hand? A. The first and the tallest. Q. Was he excited, Mr. Stratigoes? Did he yell out or speak in a soft voice, was it fluent? A. Soft voice, not loud. Q. Did he speak very fluently. A. What do you mean by that? Q. Did he speak smoothly, hesitate at all, or just say, 'Go back in the toilet?' A. Yes. Q. Did anyone of the other three men talk, Mr. Stratigoes, while you were being robbed. A. I don't remember now. Q. You don't remember? A. I don't remember now. Q. About how many feet from the door were you at the time that these boys came in? A. About 15. Q. About 20 feet? A. No, 15 or 18. Q. And did you note anything peculiar about his walk or anything, did he rush right in? A. Rushed in, yes. Q. Was there anything, Mr. Stratigoes, peculiar about the voice or voices of any of these men? Did he speak in a high pitch or was it in a deep bass? A. I don't remember now. Q. You don't remember whether he spoke in a high pitch or deep bass? A. No. Q. Did he look excited? A. I can't say that. Q. Were those the only words that you remember? A. Yes, sir."

With reference to the stand-up his cross-examination reads, in part: "Q. When this one you were listening to this voice at the stand-up, was the *voice of the man that you identified, the voice of the man that had a gun,* did he speak in the same fashion that he spoke when *he put the gun on you on the 12th of April?* A. Yes, sir. Q. In the same tone, is that right? A. Yes, sir. Q. And who was standing alongside of you at

this police stand-up? A. How is that? Q. Who was standing alongside of you when you were listening to the voices down there? A. My son." (Italics supplied)

It is therefore clear that the Commonwealth undertook to identify the appellants as two of the participants in the crime by their voices alone.

Undoubtedly, the voice is one of the generally accepted means by which the identity of an individual may be determined, and, in some instances, identity may be established beyond a reasonable doubt by that means alone. Hence, the statements of Stratigoes upon the stand, to the general effect that at the stand-up he recognized the voice of one of the prisoners (Arendash) as the voice of a person who had frequently bowled in his alley and as the voice of the tall man who had the gun and ordered him into the toilet, were admissible. As we read his testimony, it was also to the effect that the voice of another prisoner (Derembeis) was recognized by him at the stand-up as the voice of a man who had bowled in his place of business frequently and was one of his assailants but did not say anything at the time of the robbery.

The *sufficiency* of Stratigoes' testimony to support these convictions is a more difficult question. As stated, we find no other evidence connecting either of them with the crime.

The established rule is that while the sound of the voice is a relevant circumstance to be considered on the question of identity, the value of such testimony depends, first, upon some peculiarity of the voice and second, the extent of the familiarity of the witness with the voice: Wharton's Criminal Evidence, Vol. 2, p. 1803; Com. v. Brown, 76 Pa. 319.

In State v. Karas, (Supreme Court of Utah), 136 Pac. 788, a case in which the authorities have been collated and discussed, it is also stated that when a conviction is sought on such evidence alone the testimony

should be something more than the belief, or best judgment, or mere opinion of the witness.

It is not easy to apply the rule to the testimony of Stratigoes upon this branch of the case. No attempt was made to show any peculiarity of the voice of either appellant and the testimony with respect to the extent of the victim's familiarity with the voices of the appellants was far from satisfactory. The grounds upon which the identification of the respective voices was based were not shown as fully as they should have been.

Indeed we are not satisfied that the jury may not have been misled by the statement of the trial judge in his charge with respect to the extent and character of the identification undertaken by Stratigoes. That portion of the charge reads:

"He [Stratigoes] said that he saw the men come in and that he recognized two of them or probably three of them as having been in the bowling alley a number of times when he had not only seen them but heard them talking or talked with them. On the morning of the robbery, he heard only one man talk and, if I recollect correctly, *he did not identify that voice but heard only one man talk,* but he saw two of the men and he says on the stand if he were able to see now, he could identify these men, two of the men who held him up, and the men whose voices he remembers, *not from the robbery* but from previous visits to the bowling alley. Because of his recollection of the voices of those men on those previous visits to the bowling alley, he picked out at the police stand-up at the police station, the voices of those men, he tells you, who he says were present at the robbery. *You will keep in mind that Mr. Stratigoes is not identifying these voices by having heard them at the time of the robbery* because he says that he heard only one voice, if I recall his testimony correctly, and apparently *did not recognize that,* but he testifies that on a number of occasions before the robbery he knew by

sight two or three of the men and by the *peculiar characteristics* of their voices, he recognized those men at the stand-up. On the morning of the robbery he did not hear but saw those two men *but did not hear their voices.* At the stand-up, he heard the voices of *those two men,* selected them from six voices, if the testimony of the Commonwealth is to be believed and he now says that those two voices which he selected at the police station stand-up belonged to two of the men who were present at the robbery and who participated in the putting out of his eyes, that is, if I understand the Commonwealth's theory and Mr. Stratigoes' evidence correctly." (Italics supplied)

As we have already pointed out, there was no evidence of any "peculiar characteristics of their voices," and Stratigoes testified, as above quoted, that his identification of the voice of Arendash was based, in part at least, upon having heard its possessor order him into the toilet.

That at least one of the jurors was somewhat confused with respect to the basis of the victim's identification of the other defendant (Derembeis) is apparent from the following incident at the trial. While Ambrose, one of the reporters, was testifying to the manner in which the stand-up was conducted, the following colloquy occurred between a juror and the court: "Juror No. 11: He said he heard the one voice when the robbery was committed and so far he identified the two defendants. He said he only could identify one voice. Had he heard more than one voice at the time? The Court: Perhaps that will come out in the Commonwealth's case further at the end of the case. If there are any questions such as that, you may then ask the questions."

The record fails to disclose any subsequent effort to clarify this matter for the benefit of this juror and his fellow jurymen by subsequent testimony.

As the Commonwealth, upon a retrial, may, by a proper development of the grounds upon which Stratigoes' identification of the voices is based, be able to bring itself within the rule, nothing further need be said upon this feature of the case. Apparently for the purpose of fortifying the identification by Stratigoes of the voices, the Commonwealth put in evidence as a part of its case in chief a number of similar declarations made by Stratigoes, some days after the robbery and at the stand-up, to third persons. None of these declarations was made in the presence or hearing of either appellant, nor had Stratigoes' testimony been impeached in any way at that time.

For instance, Joseph Ambrose, one of the newspaper men at the stand-up, after testifying to the manner in which it was conducted, was permitted to continue: "After the first stand-up was completed, these men were taken back to the Bertillon room and I asked Mr. Stratigoes, I was standing next to him, if he could identify any of the voices and he said, 'Yes, I think 3 and 5, but please have them come out again, I want to make sure.' They came out for the second time and this time was given the same numbers but in different places. Mr. Morgan interrogated them again and asked their names, and so forth, and I asked Mr. Stratigoes, after it was over, if he could identify their voices and he said, 'Yes,' and the numbers, they were identical, but he identified the same men. He asked that they be brought out the third time, wanted to make sure, and the third time, they were interrogated fifteen minutes at this time. After it was over I asked Mr. Stratigoes if he could identify the men again and he identified them the third time and I asked if he was positively sure and he says, 'Yes.' That is all I know."

A number of police officers were called to testify to declarations made to them by Stratigoes shortly after the robbery with regard to his ability to identify his

assailants. Inspector Moore's testimony was that Stratigoes told him he recognized only one man and thought he could "tell him by his voice." Sergeant O'Brien testified Stratigoes told him he thought he could identify two of the robbers by their voices. Officer Morgan stated that Stratigoes told him he could positively identify all three of them by their voices. At the stage to which the trial had advanced when these witnesses were called, proof of these consonant statements was, under the familiar rules of evidence, inadmissible; they were mere heresay. There had been no suggestion that Stratigoes' testimony was a recent fabrication, nor had his credibility been impeached in any manner. The statements of Stratigoes to Ambrose and to others after the stand-up were proper for the consideration of the representatives of the Commonwealth in determining whether the prisoners should be indicted, but their use to bolster up and corroborate the testimony of Stratigoes at the trial was improper.

Turning now to the defense, it is to be noted that Arendash took the stand and testified freely and at length—his examination occupying 17 printed pages. In its course, he stated he had stuttered all his life, and most noticeably when excited. Arendash talked for many minutes in the hearing of Stratigoes at the trial and any peculiarities of voice, inflection or enunciation must have been apparent.

In our opinion, the interests of justice demanded, under all the circumstances then present in this unusual case, more than ordinary care and caution upon the part of those charged with the duty of seeing that no innocent man is made the victim of public clamor, prejudice or passion, aroused by the commission of a heinous crime.

We see no good reason why Stratigoes should not have been recalled, either by the Commonwealth for further examination or by counsel for Arendash for

further cross-examination, and asked to state to the jury whether he there, in open court, identified the voice of Arendash as that of the man who ordered him into the toilet.  He would thus have been given an opportunity to indicate any peculiarities of tone or enunciation which formed the basis of his conclusion, and the jury would have been given a demonstration, one way or the other, which would have been of the utmost assistance to them in performing a difficult and most important duty.

True, the Commonwealth had rested its case, but the testimony had not been closed.  Rules of procedure are intended to aid, not hamper, the ascertainment of the truth.  Every court has power to open a case prior to its final submission to the jury in order to prevent either a failure or a miscarriage of justice.

Another reason for extreme caution in the disposition of this case was the fact that each appellant set up an alibi, unusually well supported by the testimony of disinterested witnesses and the books and records of their respective employers.  If, upon another trial, the Commonwealth makes out a case entitling it to go to the jury, the evidence in support of the alibis will necessarily be for the consideration of the jurors and we shall here refer only to its general character and import.

The crime was committed within five minutes of eleven o'clock of the forenoon of April 12, 1934.

The alibi of Derembeis was that during April and May, 1934, he was employed as an assistant to the vegetable cook at the William Penn Hotel, several miles west of the Stratigoes bowling alley, and that he was engaged at his work during the entire day of April 12th. The unimpeached testimony of the secretary to the chef (who kept the time of the employees in the kitchen), of the controller, paymaster, vegetable cook, general timekeeper and fellow employees of Derembeis, fully supported by punched time cards and other records,

showed that Derembeis came to work that morning at seven o'clock and quit at eleven minutes after six that evening, and that he was not absent from his place of employment during that day for more than from twenty to thirty minutes—the time allowed for lunch which was usually eaten in the hotel. It was conceded by the Assistant District Attorney at the oral argument in this court that the time cards and records disclosed no alterations and were apparently made in the regular course of business.

The only way to avoid the conclusion that the jury indulged in a capricious disbelief of this evidence would be to adopt the hypothesis that Derembeis was able to change from his cook's white uniform into street clothes, travel a distance of several miles, meet two other men at an appointed time and place, participate in the crime, return to the hotel and resume his uniform and work without having been missed by the cook he was assisting or having been seen leaving or returning to the hotel by any employee—and all at the time of day when his services would naturally be most in demand. That theory was the only answer suggested by the Commonwealth.

Arendash's alibi was that he was employed during the day of the crime at the restaurant of George Antonopolos, some distance east of the bowling alley. In addition to the testimony of his relatives he was supported by the evidence of Antonopolos and the latter's timebook. This record showed he worked in the restaurant on April 12th for eight hours, but it did not show the hour at which he came to work or when he quit that day.

We have reviewed the record of this trial at length because we are not convinced that the Commonwealth performed its full duty to these appellants. The testimony upon which it secured their conviction is dangerous evidence at its best. Here, it was not as fully

and clearly developed as it should have been; an opportunity to test, in open court, the accuracy of Stratigoes' identification of the voice of Arendash was overlooked; and a considerable amount of inadmissible testimony was placed before the jury.

We have not discussed the specific assignments of error; they do not go to the marrow of the case. We are convinced that the interests of justice will be best served in these cases by directing that they be retried. It was stated at bar that these appellants are now undergoing sentences for various other robberies to which they pleaded guilty. They may be confessed crooks and thugs, but, under their pleas to these indictments, they are entitled to careful, calm, full and impartial trials, conducted in accordance with established principles.

The appeals at Nos. 185 and 186 April Term, 1935, of this court are sustained and new trials are directed at Nos. 8 and 9 September Sessions, 1934, of the court below.