Sterling *v.* Huey, Appellant.

Argued April 25, 1944. Before KELLER, P. J., BALD-
RIGE, HIRT, KENWORTHEY and RENO, JJ. (RHODES and
JAMES, JJ., absent).

*Abraham Fishkin,* with him *Frank Reich,* for appel-
lant.

*Robert M. Ingram,* with him *Esler W. Hays* and *W.
Davis Graham,* for appellee.

OPINION BY BALDRIGE, J., July 15, 1944:

This appeal is from the judgment obtained in the
court below in an action of trespass for injuries sus-
tained as a result of defendant shooting plaintiff in the
leg with a shot gun. It appears in the plaintiff's testi-

mony that on October 14, 1938, about 5:30 P. M., when it was just getting dark, he was running his three beagle hunting dogs on the Vogel farm, where they were kept which is adjacent to the farm upon which the defendant lived. The dogs got over upon the defendant's land and when he was on top of a hill he heard the defendant, from a distance he estimated to be 300 yards, telling him to "get the hell off the place or he would give him something to take away with him." He described this voice as being "real sharp" and identified it as that of the defendant, whom he had known for more than 20 years, frequently conversed with him, and heard the same voice many times at both short and long ranges. The plaintiff then called his dogs and as he was walking toward the Vogel farm heard a report of a gun from the same direction he heard the threats and at that moment a pumpkin bullet fired from a shot gun hit him. He fell to the ground where he lay for approximately 3 hours before he was discovered and taken to the hospital, where it was determined that he had a compound comminuted fracture of the fibula of the left leg.

Later that evening the police officers went to the defendant's home and found him and his sister, who kept house for him, in the front room. Officer Nichlas testified in part as follows.

"Q. Did you put Mr. Huey under arrest?

"A. We told him we came there to place him under arrest, and he proceeded to go upstairs and I followed him upstairs and he just got to the top of the stairs when he turned back, and we asked for the gun and he turned around and he came downstairs and he went out down over the porch to the place—to an out-house where the gun was in back of a door.

"Q. Was the gun turned over to you?

"A. The gun was turned over to the chief of police.

"Q. What did Mr. Huey say when you told him you were there to arrest him for shooting a man.

"A. He said he didn't shoot him. 'Well, Mr. Sterling says you did', and we asked him why did he leave him laying there for three hours. He said he didn't lay there for three hours. He said, 'Who told you?' I said, 'Mr. Sterling.' He said, 'Mr. Sterling was lying. He was only there for two hours.' "

The appellant acknowledged that he had fired a shot on his farm at some dogs when it was "getting just about dark," and that during the summer he had tied up plaintiff's dogs and notified him to come and get them. He described his land as partly broken up with ravines, and steep hills, which to some extent were wooded so that it was impossible to hit plaintiff with a bullet from a gun fired from the deep ravine as he alleged.

The appellant contends that the testimony was insufficient to show that it was his gun from which the bullet was fired or to identify him as the one who did the shooting. In view of the testimony of Officer Nichlas that when he charged the defendant with doing the shooting and asked for the gun he turned around and delivered it to him, coupled with the testimony of the threat, and the other attending circumstances, we think the jury was warranted in concluding that the shot was fired from defendant's gun.

The question of defendant's identity rests upon the rational inferences deduced from adequate data. Here we have testimony upon the part of the plaintiff of a long existing acquaintanceship with defendant and a familiarity with his voice, which he positively recognized as the one which uttered the threats very shortly before he was shot. A witness may testify to a person's identity from his voice alone: Wigmore on Evidence, Third Edition, Volume II, §660.

The appellant relies on *Commonwealth v. Derembeis et al.,* 120 Pa. Superior Ct. 158, 182 A. 85, where the late Judge CUNNINGHAM, speaking for this court, said:

"The established rule is that while the *sound of the voice is a relevant circumstance to be considered on the question of identity,* the value of such testimony depends, first, upon some peculiarity of the voice and second, the extent of the familiarity of the witness with the voice." (Italics supplied.) Of course, if there is something abnormal, exclusive, or individual in a voice, testimony identifying it would probably carry more weight than if the voice was without any peculiarity. But, if one is familiar with, and is able to identify, a voice by its sound or tone quality, that testimony is admissible and the weight to be given to it is a question for the jury.

In *Brown v. Commonwealth,* 76 Pa. 319, cited by Judge CUNNINGHAM in support of his statement in *Commonwealth v. Derembeis,* supra, a witness was permitted to testify as to a conversation he had with defendant through soil-pipes of the prison. The Supreme Court said that testimony was admissible as the witness said he could recognize the voice of the prisoner through the pipes, and the weight given thereto was a matter within the province of the jury.

We have no difficulty in concluding that the plaintiff was competent and his testimony was sufficient, if accepted by the jury as it was, to identify the defendant as the one who did the shooting. At the trial no objections were made to plaintiff's testifying as to his familiarity with defendant's voice and that it was his voice that expressed the threat.

The appellant complains finally that the lower court committed fundamental error in charging as follows:

"All of this is circumstantial evidence, as to who shot Mr. Sterling, whether it was Huey, whether the voice in the house was that of the sister talking to the brother, and, since they were offering no help, that they did know that Mr. Sterling was injured and lying out in the field ...... Mr. Huey's sister Bertha, his only other witness, says that there was no such talk in

the house as 'It is good for him' which apparently was offered by the plaintiff for the sole purpose of your trying to find out if these people in the house did know that Sterling was lying out in the field wounded."

The appellant argues that these statements were based upon the testimony that had been stricken from the record. The record discloses that the plaintiff testified that when he was lying on the ground that he had tried to attract attention as soon as he was shot and called to Henry Huey stating: "You have shot me. Come and get me to the road so that I can get help." He repeated this call for assistance a number of times and the words came back: "Good for you." When asked if he recognized the voice he replied: "No I did not recognize it. It was a lady's voice, but I did not know who." An objection was made to this final answer and a motion made to strike it from the record. The plaintiff's attorney conceded that he could not prove that Sterling was directing his sister, but that he could show that they were in the house. The court then sustained the objection on the ground that anything the sister said would not be binding on the defendant.

The court in its charge also misquoted the testimony in saying that defendant's sister denied that it was stated in her house: "It is good for him." She was not asked about that incident and made no mention thereof. The error was not prejudicial to the defendant. Her alleged statement was but a denial of what plaintiff attempted to prove. The trial judge expressly told the jury: ". . . . . . if your recollection as to what a witness has said is different from ours, then you disregard what we say and rely solely upon your own individual and collective recollections." At the end of the charge the counsel were asked if they had any suggestions or additions and corrections and none were made. If the defendant felt that he was harmed by the

erroneous statement of the testimony in the charge, it was his duty to call the court's attention thereto when he was asked if he had any suggestions or corrections to make. Such mistakes by a trial judge do not necessarily amount to a reversible error: *Coleman v. Reading Company*, 346 Pa. 289, 295, 29 A. 2d 499. We have frequently held that one cannot complain of an error in a statement of a charge if he does not attempt to correct it at the time of the trial: *Siegel v. Struble Bros., Inc.*, 150 Pa. Superior Ct. 343, 347, 28 A. 2d 352.

Judgment of the court below is affirmed.