## Commonwealth v. Johnson

*William C. Cahall, 3rd*, for plaintiff.

*Herbert C. Nelson*, for defendant.

HONEYMAN, J., Jan. 30, 1963.—Defendant was variously charged with the crimes of rape, assault and battry with intent to ravish and robbery on a number of bills of indictment. He entered pleas of "not guilty" on all bills and entered into a written stipulation waiving a trial before a judge and jury and agreeing to be tried before a judge alone. The undersigned member of this court presided at the trial and at the conclusion thereof he found defendant "guilty" on bills of indictment which concerned rapes and robberies upon five different women on five different dates ranging in time from February 16, 1959, to January 9, 1961. The court on two other bills, in which the alleged victim was unavailable to testify, directed a verdict of "not guilty". All of the bills of indictment were consolidated for trial. At the commencement of the trial, upon motion of counsel for defendant, sequestration of all Commonwealth witnesses was ordered by the trial judge. Following the conclusion of the trial, motions for a new trial and in arrest of judgment were filed on behalf of defendant and in which motions defendant reserved the right to file additional and supplemental reasons in support of such motions following the receipt of the transcript of the testimony. No additional reasons have been filed by counsel for defendant and neither

counsel for defendant nor the assistant district attorney who tried the case filed any briefs with the court but they both simply appeared before the court en banc and orally argued the motions. Therefore, on the record, the court only has before it the disposition of the motions supported by the usual reasons that the verdict was contrary to the evidence, and was against the weight of the evidence, and was contrary to law.

There is no question whatsoever, from a review of the record, but that the Commonwealth amply met its burden of proving the corpus delicti on each of the five indictments that gave rise to the bills of indictment on which the court found defendant guilty. No purpose would be served by any factual review of the vicious and vulgar attacks upon these victims. There was a marked similarity in the mode and manner of attack in each instance. All of them occurred in darkness and on the streets of Cheltenham and Springfield Townships, both of which are contiguous to the City of Philadelphia, of which defendant was a resident. In each case the victim was attacked from behind and was forcibly dragged to a secluded spot, thus rendering each victim incapable of observing the facial appearance and characteristics of her attacker. However, in each instance the attacker did a considerable amount of talking, and similar expressions were used in more than one instance, e.g. "don't get up until you count to fifty", "don't scream or I'll kill you." On April 25, 1961, the six women involved in the bills of indictment that were disposed of by the court in this trial, were requested by the police to come to the Cheltenham Township Police Department Headquarters in the Cheltenham Township Building, where they joined three other women who had purportedly been the victims of similar attacks in Philadelphia County. Defendant, a negro, and three other negro men were assembled at the township building at the same time

and police officers from the City of Philadelphia as well as from Springfield and Cheltenham Townships conducted a "voice line-up" which consisted of placing all of the victims on one side of a black screen which had been arranged so that those in front of the screen could not see what or who was behind the screen. On the other side of the screen were placed defendant and the three other men, and each were told to repeat certain phrases that were supplied by one of the police officers. The nine women in front of the screen were instructed to listen to the voices that they were to hear in order to determine whether they could recognize any of these voices as that of the person who had attacked them. The four men were placed in different positions five separate times, and defendant was given his choice of position on the fifth line-up. In the first line-up, defendant was number four; in the second, he was number two; in the third, number one; in the fourth, number three and in the fifth, number three. One of the police officers testified that in each of the five line-ups, all of the five women who were the victims in the bills of indictment on which defendant was found guilty, identified defendant's voice, by number, as the voice of the man who attacked them.

At the trial, each of these five women testified as to the details of the attacks made upon them, and further that they had attended the voice line-up on April 25, 1961. Each one of them testified that she had listened to all of the voices and that she had indicated to one of the police officers, by number, the voice that she recognized as the voice of her assailant. One victim testified as follows:

"I know that voice, sir. I just know it. I could hear a thousand voices, but this voice I know, and there is just something about this voice, when he said it, immediately I know that was the voice I had heard."

Another victim testified as follows.

Q. By the district attorney: "Was there any doubt in your mind as to the voice being the voice that you heard in 1959?

"A. No, sir, it is not a voice that you forget easily." Still another victim said.

Q. By the district attorney: "A line up?

"A. I guess you would call it that, and they had these people say certain words, and we had to identify them, and at that time I identified his voice all of the five times that they had these four people doing these things.

"Q. There is no question in your mind that that was the voice you heard?

"A. No, it was his voice."
The fourth victim testified.

"His voice was so soft.

And again.

"Q. What do you recall hearing?

"A. Certain things that came back to me. As soon as I heard it, I recognized the voice. The first time I heard it—the rest of the time I was sure, but I wanted to be positive.

"Q. As far as you are concerned, each time the voice spoke you were not sure?

"A. No, first, definitely I recognized it, and then the next I thought, 'I better be sure.' I was positive, but 1 wasn't sure, and the last time I definitely recognized it."
The fifth victim testified.

Q. By the district attorney: "Is there any doubt in your mind as to that voice?

"A. There was none. He kept a constant chatter up the whole time he had me down in that yard."

None of the women were able to identify defendant by sight at the trial, and none of them were able to state at the time of trial that particular *number* she had picked out of each line-up. Those numbers were

supplied by the testimony of the police officers and it is to this testimony of the officers that counsel for defendant objects, contending that same is hearsay and inadmissible. After a careful review of the cases in this and a number of other jurisdictions, we hold that this is not hearsay evidence. Hearsay evidence can be generally defined as an "extrajudicial utterance offered to prove the truth of the matter averred in said utterance". The testimony of the police officers was offered by the district attorney, not to prove the truth, dependability or accuracy of the women's identification, but merely to prove that these women had indicated by number a voice and what number that was. As to the veracity and/or accuracy of the identification itself, the women themselves appeared at the trial as witnesses and were subject to cross-examination, and thus, the dangers that the hearsay rule seeks to avoid were not present in this case. See Commonwealth v. Saunders, 386 Pa. 149 (1956), wherein the court said at page 155:

". . . As pointed out in 70 A.L.R. 911, the majority of jurisdictions have decided in favor of the admission of such so-called 'extrajudicial identification' both as substantive and corroborative evidence. It must be borne in mind that we are dealing here, not with the hearsay testimony of witnesses who merely heard such identifications being made, but with testimony given by those who themselves made the identifications at the line-up."

We, therefore, concluded that this evidence was properly admitted by the trial judge.

The next question is whether or not the evidence implicating defendant in these various crimes was sufficient to convict him beyond a reasonable doubt. Again, the court, on its own initiative and unaided by the citation of authorities by either counsel in the case, has examined appellate court decisions and text authorities on this question. There are decisions and

opinions that are rather divergent but from an analysis thereof, it would seem the weight to be given such testimony of identification by voice is for the jury, and in this case by the trial judge who was the fact-finder herein. In the early case of Brown v. Commonwealth, 76 Pa. 319 (1874), the court said at pages 338 and 339, as follows:

"The 31st, 32d and 33d assignments relate to the testimony of Joseph Trumbo, who was permitted to testify to conversations with the prisoner through the soil-pipes of the prison. Whether the voice of the prisoner could be recognized by Trumbo through these pipes, and what weight would be given to testimony, were matters within the province of the jury.

"If the offer of such evidence had come from the prisoner, it would have been an error to reject it. *E converso,* it was not error to receive it on the part of the Commonwealth."

The case of Commonwealth v. Derembeis, 120 Pa. Superior Ct. 158 (1935), standing alone, might well give this court reason to find that the identification in the instant case was not sufficiently proved to allow a conviction to stand thereon. However, that case has been distinguished by subsequent decisions. The court therein said at page 166:

"The established rule is that while the sound of the voice is a relevant circumstance to be considered on the question of identity, the value of such testimony depends, first, upon some peculiarity of the voice and second, the extent of the familiarity of the witness with the voice: Wharton's Criminal Evidence, Vol. 2, p. 1803; Com. v. Brown, 76 Pa. 319".

A close reading of that case could lead to the interpretation that the court meant that the victim must have had a familiarity with the voice on occasions prior to the date when the offense occurred. However, as was

said in the case of Commonwealth v. Tracey, 130 Pa. Superior Ct. 15 (1938) at page 18:

". . . Com. v. Derembeis, 120 Pa. Superior Ct. 158, 182 A. 85, cited by appellant, was a case of identification by the sound of a voice. That case is not controlling. It appears that there the dubious identification by voice was contradicted by an extremely well supported alibi and that this fact was largely relied on in granting a new trial."

In the Tracey case, the disputed identification was by a victim who was robbed by two men who held a gun on him and wore caps pulled down over their faces with two holes in them for eyes, but leaving their mouths visible. The court said at page 18,

". . . Whether this testimony amounted to an identification of appellant was a question for the jury. It was for them to determine, under fair and adequate instructions by the court, the facts and the opportunity afforded the witness for identification and the probative weight to be accorded his testimony: . . ."

In Sterling v. Huey, 155 Pa. Superior Ct. 398 (1944), the court cited the rule from the Derembeis case (supra) and then said at page 401:

". . . Of course, if there is something abnormal, exclusive, or individual in a voice, testimony identifying it would probably carry more weight than if the voice was without any peculiarity. But, if one is familiar with, and is able to identify, a voice by its sound or tone quality, that testimony is admissible and the weight to be given to it is a question for the jury."

Wharton's Criminal Evidence, 10th Edition, Vol. II, p. 1803 states:

"The sound of the voice is a relevant circumstance to be considered on the question of identify, and it is further said that such evidence is not a statement of opinion, but of a conclusion reached directly and primarily from the sense of hearing; that such evidence

is not to be considered as circumstantial, but as direct and positive proof of a fact, the evidentiary value of which is a question for the jury. But in criminal cases it is unquestioned that the value of such testimony depends first, upon some peculiarities of the voice, and second, the acquaintance of witness with the voice. But the previous acquaintance required to render such testimony relevant varies from hearing the voice but once, to that knowledge of it which is derived from an intimate acquaintance with the accused. . . ." [1]

2 Wigmore on Evidence, 3rd Ed. p. 771, states:

". . . It has been properly held, for example, that a witness may testify to a person's *identity* and from his *voice* alone, . . ."

The court has also reviewed an annotation entitled "Identification of Accused by his Voice" in 70 A. L. R. 2d 995, and it would seem that the prevailing weight of authority is that such evidence is admissible, has probative value, the weight of which is for the jury or other fact finder. The court has reviewed the testimony in the instant case and is satisfied and convinced that the five victims accurately and conclusively identified the defendant as their attacker by his voice.

A close and careful review of the testimony in this case shows that the Commonwealth had some additional evidence along with the identification evidence to prove the guilt of defendant. Sergeant John J. Prath of the Springfield Township Police testified:

"A. Then myself, with Sergeant Harner, Lieutenant Frith, and Sergeant Marley, interviewed Emanuel Johnson, Jr., and he said, 'Did all those women identify me?'

"He was told, 'Yes'.

"He said, 'If they said I did it, then I did it. I must have done it a hundred times.' He said, 'There is some-

---

[1] See discussion to same effect, Wharton's Criminal Evidence, 12th edition, Volume 1, §183.

thing—I have blackouts. I must be sick. What will people think of me when they hear about this? Somebody ought to shoot me.'

"He said, 'I tried to camouflage my voice so they wouldn't recognize it.' "

Lieutenant William Frith of the Northeast Detective Division of the City of Philadelphia also testified as to such statement being made by the defendant following the line-up. The testimony of Lieutenant Frith continued as follows:

"Q. Did he at any time admit that he raped—

"A. The Cheltenham woman? Yes.

"Q. Irene Hahn? Mrs. Splendor—

"A. No, not personally. He never mentioned them by name. He said the Cheltenham woman."

Detective Sergeant Theodore Marley of the Cheltenham Township Police testified as follows:

"A. Well, when the stand-up was over with and he was back in the room, I was in the room when he was being questioned by Sergeant Harner and Lieutenant Frith, and at the time he wanted to know if the women had identified him, and he was told that they did, and he said, 'Well, I guess if they say I done it, I done it. If I done it to them, I must have done it a hundred times.'

"On different occasions, Lieutenant Frith and Sergeant Harner left the room and talked to the different victims and at one time in particular I was alone in the office with Emanuel, and there is a window in that office, and he wanted to know that if he jumped out that window would I shoot him, and I told him not to think of things like that.

"He said, 'Well, if I jumped out the window would you kill me?'

"I said, 'Well, if you jumped out the window, that would only mean you were guilty.'

"He said, 'Well, I'm guilty. I just want to end it all.' "

Sergeant Warren Harner of the Cheltenham Township Police testified,

". . . (f)rom the time I went to Northwest Detective Division in Philadelphia until the time I went home that evening or—well, it was late when I went home, he had never denied one rape job that I asked him about or anybody else asked him in my presence. He never denied any of them."

Then following that, and upon cross-examination of Sergeant Harner by counsel for defendant, Sergeant Harner testified further as follows:

"Q. You say that he didn't deny any of these rape jobs which you asked him about. Which rape jobs did you ask him about?

"A. I asked him about Cheltenham Township.

"Q. Which ones are they? Did you describe in detail the time, place and date of each one, and the name of the victim?

"A. That is correct, sir.

"Q. He said, 'Did they identify me?' I said, 'Yes, they did.' He said, 'Well, if they say I did it, I did it.'

"Q. Now, which ones are they? JoAnn Woyce?

"A. Ruttle, Hahn, and Splendor.

"Q. And you described in detail to him each one?

"A. I gave him the locations and the dates.

"Q. And he said, 'I must have done a hundred', is that it?

"A. He said, 'I must have done it a hundred—at least a hundred times.' "

Defendant testified and simply made general denials of any involvement in any of the offenses that gave rise to the various bills of indictment. He completely failed in an effort to establish an alibi. He was the only witness on his own behalf. The court believes that the above quoted testimony is significant, particularly

coupled with the identification evidence, as well as the fact that defendant did not specifically deny or explain much of this conversation with the police officers. The court finds it even more significant in view of the fact that the witnesses had been sequestered, including all police officers, save one from the Cheltenham Police Department and one from the Springfield Police Department, whom the court permitted to remain with the District Attorney to act as liaison between the District Attorney as he presented the Commonwealth's evidence, and the summoning of all of the other witnesses to the court room.

Defendant was afforded every opportunity to present any defense that he might have, was given a full and fair trial, and was represented by able and competent counsel. By reason of all the foregoing, the court finds no merit in either of the defendant's motions and therefore makes the following

### *Order*

And now, January 30, 1963, the motion for a new trial and the motion in arrest of judgment are refused and defendant is ordered to appear at 9:30 a.m., February 15, 1963, in court room B to receive the sentence of the court.